David **EDWARDS**, E. Stephanie Edwards, Gerald Paschal, and Lisa Paschal, Plaintiffs,

v.

**FLAGSTAR BANK, Defendant.**

No. 95–CV–73844.

United States District Court, E.D. Michigan, Southern Division.

July 19, 2000.

Stephen R. Tomkowiak, Southfield, MI, for Plaintiffs.

Randolph D. Phifer, Phifer, Phillips, Detroit, MI, Kathleen A. Lang, Rick A. Haberman, Dickinson, Wright, Detroit, MI, Francis R. Ortiz, Dickinson, Wright, Bloomfield Hills, MI, for Defendant.

### DECISION ON POST–TRIAL MOTIONS*

COHN, District Judge.

This is a housing discrimination case (mortgage lending) brought under sections 805 and 818 of the Fair Housing Amendment Act of 1988, 42 U.S.C. § 3605 and § 3617, and corresponding regulations promulgated by the Department of Housing and Urban Development pertaining to mortgage lending, 24 C.F.R. §§ 100.120 to 100.130, as well as the Civil Rights Act of 1866 and 1870, 42 U.S.C. § 1981 and § 1982, and section 504 of Michigan's Elli-

* This is an edited version of the Bench Opinion of April 27, 2000.

ot–Larsen Civil Rights Act, M.C.L. § 37.2504.

In general, plaintiffs claim that they were the subjects of racial discrimination in the manner in which defendant Flagstar Bank (Flagstar), a mortgage bank, handled their mortgage loan applications or in the way the terms and conditions of their mortgage loans were set. The Memorandum and Order of August 14, 1998 briefly describes the background of the case.

Five sets of plaintiffs went to trial:

Audra Carson (Carson) claimed she was the victim of racial discrimination in the manner in which her application for a mortgage loan was handled. She did not close with Flagstar.

Paquita Davis–Friday (Davis–Friday) claimed she was the victim of racial discrimination in the manner in which her application for a mortgage loan was handled. She did not close with Flagstar.

Heath Thomas (Thomas) claimed he was the victim of racial discrimination in the manner in which his application for a mortgage loan was handled. He did not close with Flagstar.

David Edwards and E. Stephanie Edwards, his wife, (the Edwards) claimed they were the victims of racial discrimination in the manner in which their efforts to refinance their mortgage loan with Flagstar was handled. The Edwards eventually obtained a new mortgage loan from Flagstar.

Gerald Paschal and Lisa Paschal (the Paschals) claimed they were the victims of racial discrimination in the manner in which their application for a mortgage loan was handled. The Paschals were approved for a mortgage loan by Flagstar on terms considerably less favorable than for which they applied and eventually obtained a mortgage loan elsewhere.

Each of the plaintiffs is an African American.

Flagstar is a large banking institution operating in the Detroit metropolitan area and elsewhere and specializing in residential mortgage loans.

Plaintiffs' claims were tried to a jury in November of 1999. The jury returned a verdict in favor of Flagstar on the claims of Carson, Davis–Friday, and Thomas, and returned a verdict in favor of the Edwards and Paschals. Particularly, the jury found the Paschals proved by a preponderance of the evidence that their race or color was one of the reasons why they did not obtain a mortgage loan from Flagstar. The jury awarded the Paschals $250,000 in compensatory damages and $325,000 in punitive damages. As to the Edwards, the jury found that they proved by a preponderance of the evidence that their race and color was one of the reasons why they did not obtain a mortgage loan on their initial application with Flagstar. The jury awarded the Edwards $125,000 in compensatory damages.

## II. The Pending Motion

Before the Court is Flagstar' s motion for judgment as a matter of law, Fed. R.Civ.P. 50(b), or in the alternative for a new trial, Fed.R.Civ.P. 59, or in the alternative for a remittitur.

Briefly stated, Flagstar says that the evidence at trial was insufficient to support the jury's finding of racial discrimination and therefore it is entitled to a judgment as a matter of law. Alternatively, Flagstar says that at a minimum, it is entitled to a new trial because the evidence was insufficient both as to liability and damages, or says that a remittitur on damages is appropriate because the amounts awarded by the jury, both compensatory and punitive, were grossly excessive.

After a thorough review of the record, albeit short of that which would have occurred had the Court been the fact finder, as the Court is not retrying the case, the motion will be denied in all respects.

## III. The Trial

This was a long, complex, and hotly contested case. The trial extended over 14

days. Thirteen witnesses testified in plaintiffs' case, including Carson, Davis-Friday, Thomas, Gerald Paschal and E. Stephanie Edwards, loan officer employees of Flagstar, the chief financial officer of Flagstar, Calvin P. Bradford (Bradford), an expert in reviewing and comparing mortgage loan files, Marvin M. Wing (Wing), an expert in econometrics, Clifford C. Schrupp (Schrupp), the director of the Fair Housing Center of metropolitan Detroit, and a tester.

Plaintiffs introduced scores of documents into evidence, including plaintiffs' application files with Flagstar, other customer files of mortgage loans with Flagstar, correspondence and guidelines, underwriting standards, testing data and data provided to the government by Flagstar under the Home Mortgage Disclosure Act (HMDA), 12 U.S.C. §§ 2801 *et seq.*, commonly known as HMDA data. The customers' files consisted of applications, credit reports, employment verifications, approval and rejection letters, conditional approval letters, internal correspondence, memoranda and the like.

Flagstar called 16 witnesses, including underwriters, processors, loan officers, branch managers, senior executives in charge of underwriting and compliance, Dr. Edward Rothman, an expert in statistics, and an appraiser. Flagstar's exhibits, by and large, were similar to the exhibits introduced by plaintiffs.

## IV. The Rule and Law Generally

### A. Motion for Judgment as a Matter of Law: Fed.R.Civ.P. 50(b)

■ The principles governing a motion for judgment as a matter of law are best stated by the Court of Appeals for the Sixth Circuit in *Morelock v. NCR Corporation*, 586 F.2d 1096, 1104 (6th Cir.1978), as follows:

The issue raised by a motion for judgment n.o.v. is whether there is sufficient evidence to raise a question of fact for the jury .... [T]he trial court may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury.

.    .    .    .    .

The motion should not be granted unless the Court, after so viewing the evidence, "is of the opinion that it points so strongly in favor of the movant that reasonable minds could not come to a different conclusion...," *Id.* at 1104-05.

### B. Motion for a New Trial: Fed.R.Civ.P. 59

#### 1. The Sufficiency of the Evidence

■ The principle governing a motion for a new trial is best stated in Wright and Miller, as follows:

It may be doubted whether there is any verbal formula that will be of much use to trial courts in passing on motions of the type now being considered. Necessarily all formulations are couched in broad and general terms that furnish no unerring litmus for a particular case. On the other hand, the trial judge does not sit to approve miscarriages of justice. The judge's power to set aside the verdict is supported by clear precedent and common law and far from being a denigration or a usurpation of a jury trial, has long been regarded an integral part of jury by trial as we know it. On the other hand, a decent respect for the collective wisdom of the jury and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of its own doubts on the matter. Probably all that the judge can do is balance these conflicting principles in light of the facts of the particular case. If, after having given full respect to the jury's findings, the judge on the entire evidence is left with a definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.

11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2806 (2d ed.1995). *See also*

*Clay. v. Ford Motor Co.*, 215 F.3d 663, 672 (6th Cir.2000) (holding that "a district court must compare and weigh the opposing evidence and it must set aside the verdict if it determines that the verdict is against the clear weight of the evidence.") (citation omitted).

## 2. The Size of the Verdict

Wright and Miller is also instructive as to the size of a verdict, stating as follows:

A motion under Rule 59 is an appropriate means to challenge the size of the verdict. The Court always may grant relief if the verdict is excessive or inadequate as a matter of law, but this is not to limit the Court's power. It may also grant a new trial if the size of the verdict is against the weight of the evidence.

This is merely a special application of the general power of the trial court to set aside a verdict that is against the weight of the evidence, and the general principles developed in the preceding section are applicable to a motion on this ground. The court is not free to set aside the verdict merely because the judge might have awarded a different amount of damages, but it may do so if the proceedings have been tainted by appeals to prejudice or if the verdict in the light of the evidence is so unreasonable that it would be unconscionable to permit it to stand. The phrase "shocks the conscious of the court," among others, is much used in the cases but adds very little by way of guidance. The power exists from the trial judge whether the verdict is unreasonably high or unreasonably low.

There is a difference, however, that must be noted. If the Court finds that the verdict is unreasonably high, it may condition denial of a motion for a new trial on plaintiff's consent to a remittitur. If the verdict is too low, it may not provide for an additur as an alternative to a new trial.

11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2807 (2d ed.1995).

## 3. Remittitur

In *Strickland v. Owens Corning*, 142 F.3d 353 (6th Cir.1998), the Sixth Circuit set forth the following standard for remittitur:

A motion for new trial seeking a remittitur of a jury's verdict ... should be granted only if the award clearly exceeds the amounts which, under the evidence in the case, was the maximum that a jury could reasonably find,

*Id.* at 357 (citing *Roush v. KFC Nat'l. Management Co.*, 10 F.3d 392, 397 (6th Cir.1993) (citations and internal quotation marks omitted)).

In addition, in *Farber v. Massillon Board of Education*, 917 F.2d 1391 (6th Cir.1990), the Sixth Circuit stated:

As a general rule, this Court has held that "a jury verdict will not be set aside or reduced as excessive unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss.

"A trial court is within its discretion when remitting a verdict only when after reviewing all of the evidence in a light most favorable to the awardee it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice, or so excessive or inadequate as to shock the conscience of the Court. If there is any credible evidence to support a verdict, it should not be set aside. The trial court may not substitute its judgment or credibility determinations for those of the jury. Moreover, it abuses its discretion in ordering either remittitur or new trial when the amount of the verdict turns upon conflicting evidence and the credibility of witnesses."

*Id.* at 1395 (citations omitted). The Sixth Circuit also made clear that a remittitur, when appropriate, must offer a new trial as an alternative:

Moreover, even if remittitur had been appropriate here, a forced remittitur without the offer of the option of a new trial on the issue of damages constitutes error, requiring this court to reverse and reinstate the verdict."

*Id.* at 1396.

### 4. Determination of Excessiveness

██ As to the determination of excessiveness, the court in *Darby v. Heather Ridge*, 827 F.Supp. 1296 (E.D.Mich.1993), a housing discrimination case, said:

One factor to be considered in determining whether to set aside an award of damages is whether the award is out of line with awards in similar cases. The court is fully aware that "the assessment of damages, especially for intangible harms, such as humiliation and distress, is inescapably judgmental and subjective to a large degree, and to that degree therefore discretionary." The Court is also mindful of the Sixth Circuit's admonition to appellate courts that they "should not attempt to reconcile widely varied past awards for analogous injuries 'which in the abbreviated appellate decisions of them seem somewhat similar.'"

*Id.* at 1299–1300 (internal citations omitted).

### 5. Punitive Damages—Excessiveness

██ Two cases from the Supreme Court of the United States are instructive on the question of excessiveness when it comes to punitive damages. First, in *Browning–Ferris Ind. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278–79, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), the Supreme Court said: "Federal law ... will control on those issues involving the proper review of the jury award by a federal district court ..." Second, in *BMW of North America v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court set down the rule on the excessiveness of punitive damages when it said the following:

Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition..... Only when an award can fairly be categorized as "grossly excessive" in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.

*Id.* at 568, 116 S.Ct. 1589 (citations omitted).

Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. As the Court stated nearly 150 years ago, exemplary damages imposed on a defendant should reflect "the enormity of his offense."

*Id.* at 576, 116 S.Ct. 1589 (citations omitted).

The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff.

*Id.* at 580, 116 S.Ct. 1589 (citations omitted).

Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness.

*Id.* at 583, 116 S.Ct. 1589 (citations omitted).

### C. Fair Housing

██ The plaintiffs' case, as previously described, is based on a violation of the Fair Housing Act of 1968 as amended, 42 U.S.C. § 1981 and § 1982. The most recent case to expand on these laws in a discrimination context is *Alexander v. Riga*, 208 F.3d 419 (3d Cir.2000), where the Court of Appeals for the Third Circuit said:

The Fair Housing Act was intended by Congress to have "broad remedial intent." As this case stands after trial, the net result of the plaintiffs' victory was that they were out–of–pocket for the expenses of litigation. Historically enforcement of the civil rights statutes depends, in large measure, on the willingness of the private plaintiffs to pursue individual cases. The Supreme Court has attached importance to each individual's prosecution of discrimination cases under the statutes:

> The objectives of the [discrimination statutes] are furthered when even a single [individual] establishes that [another individual] has discriminated against him or her. The disclosure through litigation of incidents and practices that violate national policies respecting nondiscrimination ... is itself-important.

*Id.* at 425–26 (citation omitted).

.    .    .    .    .

And, with respect to the Fair Housing Act in particular, the Supreme Court has held that

> since the enormity of the task of assuring fair housing makes the role of the [United States] Attorney General in the matter minimal, the main generating force must be private suits in which ... the complainants act not only on their own behalf but also "as private attorneys general in vindicating a policy that Congress considered to be of the highest priority.

.    .    .    .    .

Here, there is a specific damages provision in the plain language of the statute. 42 U.S.C. § 3613(c) provides the relief which may be granted when, as here, private individuals seek to enforce the Fair Housing Act:

> (1) In a civil action under subsection (a) of this section, if the court finds that a discriminatory housing practice has occurred ..., the Court may

award to the plaintiff actual and punitive damages.

*Id.* at 430 (citation omitted).

.    .    .    .    .

The standard for punitive damages in a federal civil rights action was set by the Supreme Court and does not require "outrageousness": A jury may "assess punitive damages in [a civil rights action] when the defendant's conduct is shown to be motivated by evil motive or intent or when it involves reckless or callous indifference to the federally protected rights of others."

*Id.* at 430–31 (citation omitted).

.    .    .    .    .

■ "Malice" and "reckless indifference" in this context, however, refer not to the egregiousness of the landlord's conduct, but rather to the landlord's knowledge that it may be acting in violation of federal law.

*Id.* at 431 (citation omitted).

### V. The Law of the Case

Neither party took exception to the jury instructions. Accordingly, the jury instructions are a proper statement of the law of the case. The jury was instructed as follows:

#### A. Liability

It is unlawful for a mortgage lender, such as Flagstar Bank, to refuse to process or make a loan for the purchase or refinancing of residential real estate to a mortgage applicant based on the person's race or color.

In this connection, it is also unlawful in the making of mortgage loans to impose different terms of conditions because of a person's race or color. Unlawful conduct includes, but is not limited to, the type of loan, interest rate, or down payment because of the race or color of the applicant.

Each of the Plaintiffs' cases must be considered separately.

In this case, Plaintiffs (1) Audra Carson, (2) Heath Thomas, (3) Paquita Davis–Friday, (4) Gerald and Lisa Paschal, and (5) David and E. Stephanie Edwards, each claim that Defendant Flagstar Bank unlawfully discriminated against them in failing to approve their mortgage applications or request for pre-qualification; approved their mortgage applications on discriminatory terms and conditions; or failed to close on their mortgage approval. Flagstar Bank denies the claims. It is your responsibility to decide whether each Plaintiff, or set of plaintiffs in the case of the Paschals and the Edwards, has established his or her claim against Flagstar Bank by a preponderance of the evidence.

A Plaintiff to recover must show that Flagstar Bank discriminated against him or her. A Plaintiff, however, is not required to produce direct evidence of discrimination. Discrimination may be inferred from the existence of other facts.

The law prohibits all forms of discrimination, sophisticated as well as simple-minded, and thus disparity of treatment between whites and blacks, burdensome application procedures, and tactics of delay, hindrance, and special treatment may be considered evidence of discrimination.

You have been shown statistics in this case. Statistics are another form of evidence from which you may find, but are not required to find, that the Flagstar Bank discriminated against a Plaintiff. You should evaluate statistical evidence along with all the other evidence received in the case in deciding whether a Plaintiff in this case has proven that Flagstar Bank discriminated against that plaintiff as charged.

Liability can be found if race is only one factor, rather than the sole factor in the refusal to grant or close on a mortgage request, or a request for the pre-qualification for a mortgage.

In the context of this case, a "tester" is a person who without an intent to obtain a mortgage, poses as a mortgage applicant for the purpose of collecting evidence of lending practices.

Evidence of testing activities, if otherwise found to be credible, is an appropriate method of demonstrating discriminatory conduct on a defendant's part. The fact that a tester may not have given the defendant accurate information, and the fact that he or she may have approached a loan officer or other employee of the defendant without any intention of obtaining a mortgage, are not factors that impair the tester's credibility as a witness.

It is not a defense to liability that Flagstar Bank may not have discriminated against others on the basis of race or color. The law focuses on eradicating discrimination against individuals. If Flagstar Bank discriminated against a Plaintiff, it is no defense that Flagstar Bank did not discriminate against other individuals based on race or color.

In this case, Flagstar Bank is a corporation. A corporation can only act through its offices, directors, agents, and employees. In this case, it is admitted that the officers, directors, agents and employees of the corporation were engaged in the business of the corporation when they took the actions at issue in this case. Therefore, you should consider Flagstar Bank to be responsible for each of the actions taken by its officers, directors, agents, and employees, which were within the scope of their agency. If you find that the officers, directors, agents, and employees of Flagstar Bank, acting within the scope of their agency, violated the law, then you must find that Flagstar Bank violated the law.

### B. Compensatory Damages

If you find in favor of a Plaintiff then you should award him or her such actual and compensatory damages as you find, from a preponderance of the evidence, were proximately caused by the acts of

Flagstar Bank in refusing to approve and close on the Plaintiff's mortgage application or pre-qualification request, or refusing to negotiate for the approval of the Plaintiff's mortgage application, or otherwise refusing to make the mortgage loans available or discouraged or denied the mortgage loans to the Plaintiff.

If you find that a Plaintiff was unlawfully discriminated against by Flagstar Bank, you are also to consider whether and to what extent he or she suffered any emotional injury as a result of that discrimination. With regard to emotional injury, you may compensate a Plaintiff for any humiliation, embarrassment, mental anguish, or emotional distress that he or she experienced or may in the future experience as a result of any discrimination that you find from the evidence. This type of relief is called compensatory damages.

In this regard, you may consider that discrimination based on race is an affront of which embarrassment and humiliation are natural consequences. Thus, you may infer emotional injury from such conduct. In addition, of course, you should consider on this question the testimony of the witnesses and any evidence of mental or emotional injury.

### C. Punitive Damages

If you award compensatory damages, then you may award punitive damages. If you find that Flagstar Bank unlawfully discriminated against a Plaintiff, and also find, from a preponderance of the evidence, that the acts of Flagstar Bank were "maliciously" or "wantonly" or "oppressively" done, then you may award a Plaintiff punitive damages in addition to actual damages. If you award punitive damages, these damages must be separately stated in your verdict.

The law permits, but does not require, the jury in certain cases to award the injured person punitive and exemplary damages in order to punish the wrongdoer for some extraordinary misconduct and to serve as an example or warning to others not to engage in such conduct.

An act or failure to act is "maliciously" done if prompted or accompanied by ill will, or spite, or a grudge either toward the injured person individually or toward all persons in one or more groups or categories of which the injured person is a member.

An act or failure to act is "wantonly" done if done in reckless or callous disregard of or indifference to the rights of one or more persons including the injured person.

An act or failure to act is "oppressively" done if done in a manner which injures or damages or otherwise violates the right of another person with unnecessary harshness or severity by a misuse or abuse of authority or power or by taking advantage of some weakness or disability of the misfortunes of another person.

Whether or not to make an award of punitive and exemplary damages in addition to actual damages is a matter exclusively within the province of the jury if you unanimously find, from a preponderance of the evidence in the case, that Flagstar Bank's acts or omissions which caused actual damage to a Plaintiff were maliciously or wantonly or oppressively done. But you should always bear in mind that such extraordinary damages may be allowed only if you first unanimously award a Plaintiff a verdict for actual or compensatory damages. You should also bear in mind not only the conditions under which and the purposes for which the law permits an award and punitive and exemplary damages, but also the requirement of the law that the amount of such extraordinary damages, when awarded, must be fixed with calm discretion and sound reason, and must never be awarded, or fixed in any amount, because of any

sympathy, or bias, or prejudice with respect to any party to the case.

In assessing damages, you should bear in mind that the purpose of punitive damages is not to compensate the injured party. Rather, punitive damages are awarded to punish a defendant and to serve as an example and a warning to others not to engage in such conduct.

If you determine that it is appropriate to award punitive damages, you should consider several factors in determining what amount of such damages will serve as an appropriate penalty against Flagstar Bank and as a deterrent to others. These factors include Flagstar Bank's financial status, Flagstar Bank's motivations, and the degree of purposefulness of willfulness of Flagstar Bank's actions.

If you award punitive damages, you should determine the amount (if any) of punitive damages based on the degree of wrongdoing and the financial status of Flagstar Bank.

### VI. The Evidence at Trial

#### A. Generally

The evidence at trial to establish liability consisted of the following: (1) the history of the Paschals' and the Edwards' efforts to obtain mortgage financing, which in the case of the Paschals was for a new mortgage, and in the case of the Edwards was for refinancing an existing mortgage; (2) a study of comparable files on the basis of relevant facts in each file, such as type of loan, application date, time periods, Flagstar's policies, and underwriter response, and facts relating to comparability and additional relevant facts; (3) analysis of collective data on the basis of type of loans, range of loans, racial and financial profiles of borrowers, rates of rejections and the like submitted to federal agencies; and (4) testing data.

Bradford expressed the opinion that white applicants and borrowers were treated more favorably than the Paschals and Edwards. *See* Px43, *Comparable Loan File Analysis.* Wing expressed the opinion that there was a significant difference in rate of denial for white applicants and African–American applicants in favor of white applicants. *See* Px39, *Report on Statistical Evidence of Racial Disparities in Home Mortgages Lending.* Bradford and Wing were vigorously cross-examined.

The testing data as explained by Schrupp displayed evidence of discrimination.

Flagstar employees testified on how mortgage loan applicants were processed from initiation by mortgage loan officers, the gathering of relevant data by processors, and approval or rejection of applications by underwriters. Underwriting standards were thoroughly explored. Flagstar employees also testified as to the lack of any initiative or response by Flagstar when it was disclosed to Flagstar that there may be discrimination in its mortgage loan processing.

#### B. The Paschals

The Paschals' application for a mortgage loan was prompted by their purchase of a new home then under construction. Their initial loan request was turned down because of a two year old bankruptcy and that they had not yet sufficiently established credit. After Flagstar offered them a mortgage loan on substantially less favorable terms than requested, the Paschals went elsewhere.

The application process extended from May 30, 1992 to November 4, 1992, five months and four days. The Paschals first applied for a $75,000 mortgage at a 5.625 percent interest rate for 30 years. There were five iterations of a proposed mortgage loan. Ultimately, Flagstar offered a $55,000 mortgage for 30 years at a 16.5 percent interest rate.

Bradford opined, based on his evaluation of the salient factors involved in the Paschals' application, that comparable white applicants obtained mortgage financing from Flagstar, i.e., applicants with the

same credit history. This led Bradford to conclude that the Paschals received different and adverse treatment in comparison to the treatment received by white applicants and that the determinant variable was the race of the Paschals.

Mrs. Paschal did not testify. There was no direct evidence of discrimination. The Paschals did not suffer economic damage.

As to non-economic damages, the Paschals' papers contain the following accurate description of the evidence adduced at trial:

In 1992, the Paschals sought a larger home for their family. The selected a location in Ypsilanti, Michigan, for the construction of their family's first home. On June 2, 1992, the Paschals felt "positive" after their meeting with loan officer Dave Reed who, after reviewing the Paschals' qualifications, pre-qualified them for a $75,000 mortgage, at just over 10% and an initial adjustable interest rate of 5.625%.

On approximately June 18, 1992, Reed again assured the Paschals that they had a good application, and arranged for authorization to be sent to the builder for construction of the home. On June 20, 1992, the Paschals entered into a sales agreement for the construction of the home.

From late June to approximately July or August 1992, the Paschals, as a family, drove by the home each day. They met, and apparently began to form relationships, with neighbors in the new subdivision. In approximately late July or early August 1992, Reed informed the Paschals of Flagstar's formal approval of their loan application.

At this point, the Paschals would naturally have anticipated the completion of their home, the closing on their mortgage with Flagstar, and their family's settling into their home. Gerald Paschal testified at trial that he and his wife had told family members and friends about the home, which is what anyone would have done in their situation.

At this point, however, the Paschals' ordeal started. At the end of August 1992, Reed learned of Flagstar's sudden rejection of the Paschals' loan request, and the bank's counter-offer of a $55,000 loan amount. This required a down payment of $30,000 or 35% of the $85,000 purchase price of the home.

Gerald Paschal, and his wife, were "stunned" by the bank's actions, especially after the repeated assurances of mortgage approval. The $55,000 loan amount would require the Paschals to pay $30,000 or more from their liquid assets, depleting the Paschals of savings that otherwise would be available for any unexpected financial need.

Appreciating the Paschals' vulnerable situation, Reed himself "panicked" and desperately tried to "fix" the situation for the Paschals, and save their home. In approximately early September 1992, Reed took the Paschals' file to Mortgage Solutions. Gerald Paschal, in turn, spoke to Denise Prat at Mortgage Solutions, and was relieved to learn that, based on the information in the Paschals' loan file, Pratt could preliminary approve the Paschals for a 30–year $75,000 mortgage, at a fixed 7.99% interest rate.

The next day, however, Gerald Paschal learned that Mortgage Solutions had been forced by Flagstar to withdraw their preliminary mortgage approval. Flagstar also retaliatorily fired Reed for taking the Paschals' file to Mortgage Solutions. At this point, the Paschals were again confronted with the loss of their home—and no doubt dismayed at Flagstar for actively working against them.

Lacking any alternative, the Paschals, on or about September 24, 1992, returned to Flagstar's branch office location. At the branch office, the Paschals met with a new loan officer, who sarcastically "congratulated" them on their "approval" for a mortgage in the amount

of $59,600 (just $4,600 more than the utterly insufficient $55,000 loan amount). This still required a 30% down payment. More importantly, the "approval" required the Paschals to pay an outrageous 16.490% interest rate on the loan, along with $596 in costs and up to 10 points.

As Steve Brooks, Flagstar's branch manager, testified at trial, the effective interest rate for such a loan, including costs and points, would be 18% to 19%. The jury could infer that Gerald Paschal, who had a college degree in accounting and worked as an accountant, would be outraged by the "credit card" kind of interest rate insisted upon by Flagstar.

The Paschals were "devastated" by the apparent loss of their home. Yet they could not outright decline the outrageous terms since rejection of the proposed loan would result in apparent loss of the home, particularly after they had told family members and friends about their new home. Facing reality, the Paschals, a few days later on September 29, 1992, decided to withdraw their loan application with Flagstar.

Although fired by Flagstar, Reed continued to help the Paschals save their home. Reed subsequently took the Paschals' loan file to N.V. Phillips & Co./Executive Mortgage ("N.V.Phillips"). On January 30, 1993, a full *five months* after Flagstar's discriminatory rejection of their original application, the Paschals closed on a mortgage for their home.

Yet the January 30, 1993, closing did not completely end of the Paschals' ordeal. The N.V. Phillips mortgage would increase to 12.750% percent after 6 months, and potentially increase to 18% over the term of the mortgage. As a result, Reed arranged for the Paschals' refinance of their mortgage, which took place on or before July 30, 1993.

Plaintiffs' Supplemental Exhibit 6, entitled *Narrative Statement of Testimony Relating to Damages as to the Paschals.*

## C. The Edwards

The Edwards wanted to refinance their home mortgage with Flagstar because of a favorable change in interest rates. Their home was purchased in 1988 new for $110,-000. In mid–1994, the Edwards applied for a mortgage loan of $89,300. The appraisal came in at $94,000, which did not allow for a $89,300 mortgage. There was no explanation for why the home dropped in value. Flagstar made no effort to rationalize the current appraisal with the initial purchase price. In May 1994, the application was rejected on grounds of insufficient funds to close, inadequate collateral, and "do not grant · credit on terms requested." The Edwards made a second application, which Flagstar rejected in September 1994. Finally in November 1994, on a third application, the Edwards financed their existing mortgage with a 30 year mortgage at a 10.875 percent interest rate. The terms of the new mortgage, because of its 30 year length, were less favorable than those requested in the initial application.

The mortgage loan application process extended over eight months and ten days. It began with an application for a $90,000 15–year mortgage at a 7.875 percent interest rate and ended up with an $83,900 mortgage for 30 years at a 10.875 percent interest rate. There were three iterations. For the final mortgage the monthly payments were essentially the same as the original application. The difference, however, is a 30 year term instead of a 15 year term.

Bradford opined, based on his evaluation of the salient factors involved in the Edwards' application, that comparable white applicants obtained mortgage financing from Flagstar. This led Bradford to conclude that the Edwards' received different and adverse treatment in comparison to the treatment received by white applicants and that the determinant variable was the race of the Edwards.

Mr. Edwards did not testify. There was no direct evidence of discrimination. The Edwards' did not suffer economic damage.

As to non-economic damages, the Edwards' papers likewise contain an accurate summary of the evidence adduced at trial, as follows:

> The Edwards applied with Flagstar, on March 11, 1994, for a 15–year mortgage refinance, at a conforming 7.875% fixed interest rate. By June 1994, the Edwards, realizing they were fully qualified to obtain mortgage approval on the terms applied for, were frustrated by Flagstar's delays and refusal to provide a 15–year mortgage at the requested interest rate. By this time, the Edwards began to suspect they were being discriminated against by Flagstar. Moreover, according to Stephanie Edwards, she and David Edwards had become upset to the point of having difficulty sleeping at night.

> The Edwards' disappointment and frustration with the treatment they received from the bank continued through November 1994. During this period, they were forced into a 30–year mortgage, and had their interest rate increased at first to 9.50%, and then to 10.875%. They continued to have difficulty sleeping at night. As the months wore on, their frustration and disappointment grew into anger.

> Finally, looking back at the humiliating treatment they received from Flagstar in the eight month period from the time of their original application to the date of closing, the Edwards felt the bank treated them as second class citizens due to their race.

Plaintiffs' Supplemental Exhibit 5, entitled *Narrative Statement of Testimony Relating to Damages as to the Edwards.*

### D. Flagstar

Flagstar vigorously cross-examined each of the plaintiffs who testified and the Flagstar witnesses called by plaintiffs. Flagstar's witnesses walked through each of the plaintiffs' files explaining the reasons for actions taken and for rejecting applications or less favorable terms offered than for which initially applied. These witnesses also testified to the various underwriting guidelines and standards applicable to the several applications involved. Flagstar took issue with Bradford's comparable files, and the salient factors in the files he analyzed, as not being comparable. Wing's conclusions as to the HMDA data were also challenged. Lastly, Flagstar's senior executive explained the way in which mortgage applications were processed, compliance studies, and their efforts to ensure that fair lending principles were followed.

There was a thorough vetting of Flagstar's operations, particularly with regard to plaintiffs' application process, Bradford's comparable files, as well as Flagstar's practices in general.

### VII. Decision on Liability

#### A. Judgment as a Matter of Law: Procedural

It is well established that in order for Flagstar to make a motion for judgment as a matter of law it must have first moved at the conclusion of proofs for a dismissal in a reasoned motion. *See* Jones, Rosen, Wegner & Jones, *Rutter Group Practice Guide: Federal Civil Trials and Evidence* 13–7 (The Rutter Group 1999); *American And Foreign Ins. Co. v. Bolt,* 106 F.3d 155, 160 (6th Cir.1997). It is disingenuous for the Paschals and the Edwards to argue that Flagstar failed to do so. At the close of the proofs the following colloquy took place:

> The Court: You are making a motion for judgment as a matter of law, right?

> Mr. White: [Flagstar's counsel]

> Directed verdict, Your Honor.

> The Court: It's called judgment as a matter of law.

> The Court: For all of the reasons known to the law, right?

Mr. White: For all those, Your Honor.

. . . . .

The Court: Let me offer you a thought. This case pictures, more than anything else, frustrated expectation on the part of the mortgage borrowers occasioned in part by questionable creditworthiness, in part by slow response to underwriting questions raised by lenders during the course of loan processing, and perhaps other factors. The record contains no direct evidence of racial discriminatory treatment. The chain of circumstances pointing to the conclusion that the plaintiff borrowers were treated differently than comparably situated white applicants is, considering the multitude involved, rather weak. However, it is sufficient to make out a case for jury decision. Accordingly, the motion for judgment as a matter of law is denied.

Mr. White: Your Honor, would you consider a brief?

The Court: What brief?

Mr. White: I didn't get a chance to file one.

Tr. 11/17/99; pp. 58–59.

The Court clearly did not allow Flagstar to be more specific with regard to the grounds it relied on for its motion, and the Paschals and Edwards clearly did not object to the manner in which the Court handled the motion.

### B. Judgment as a Matter Of Law: Substantive

■ There is no basis for a judgment as a matter of law in favor of Flagstar. The evidence in a light most favorable to the Paschals and Edwards supports the jury's verdict that both parties proved by a preponderance of the evidence that race was a factor in the way in which Flagstar dealt with each of them.

This evidence included: Bradford's conclusions that the only variable in their treatment by Flagstar compared to white applicants was that they were treated less favorably because of their race; the HMDA data which generally proved that Flagstar acted with a discriminatory animus; and the testing data which displayed a discriminatory animus.

The record clearly supports the conclusion that the jury could reasonably have found that both the Paschals and the Edwards were victims of racial discrimination, *i.e.* that they were treated differently and less favorably than similarly situated white applicants and that the only variable in the comparable experience was race. As to the Pachals, the finding is evidenced in the ultimate rejection of their mortgage loan. As to the Edwards, the finding is evidenced in the extended time it took them to close on a mortgage loan, and the considerably less favorable terms and conditions of the ultimate mortgage.

### C. New Trial

In viewing the evidence in a light most favorable to the Paschals and Edwards, the Court has no firm conviction that there is an injustice in the liability verdict or that it is a mistake to allow the liability verdict to stand. The sequence of events, the length of time, the comparable data, the HMDA data, the testing data, all support the conclusion that the verdict was certainly one which a jury could reasonably have come to as to liability. It is also not a verdict which exhibits any bias, prejudice or passion.

### VIII. Decision on Damages

### A. Compensatory Damages

■ It is perfectly clear that there should not be a completely new trial on the grounds of excessiveness of the damages. Therefore, the only question is whether there should be a remittitur. The test is not what the Court would have awarded; but what the jury did award. The jury's damage verdict was not out of line. This was not a runaway jury.

The parties have cited a number of cases in which there were damage awards for discrimination. These cases cover both compensatory damages and punitive damages. Attached as Appendix A is a breakdown of these cases displaying in tabular form the nature of conduct, injury, the amount of compensatory damages awarded, the amount of punitive damages awarded, judge or jury, and a scoring of them as to the level of harm to the plaintiff on a scale of 1 to 10 and the level of defendant's conduct on a scale of 1 to 10. Based upon this analysis the compensatory damages awarded by the jury are not excessive or out of line with awards in similar cases.

### B. Punitive Damages

■■■ As to punitive damages, the jury had a right to consider Flagstar's financial status and award an amount large enough to act effectively as a deterrent. Considering the evidence at trial, moreover, the jury could reasonably have found from the testing and statistical evidence, that Flagstar violated established underwriting guidelines. The jury could also have found that Flagstar did not adequately report its HMDA data loan denials. The jury could have taken into consideration Flagstar's lack of fair lending training and its management's failure to effectively discipline loan officers known to have made blatantly racial statements. Particularly with regards to the Paschals, Flagstar knew their need for mortgage financing, and the final mortgage terms offered were so far out of line with what they reasonably needed or could have afforded as to have been illusory. In sum, the award for punitive damages to the plaintiffs was also within a range that does not allow for disturbance by the Court.

### IX. Conclusion

There is no good reason to set aside the jury's verdict. There is no good reason to require a retrial. There is no good reason to reduce the jury's verdict.

Accordingly, Flagstar's motion is DENIED.

SO ORDERED.

### Appendix A

### TABLE OF VALUES FOR DAMAGES

### *Edwards and Paschal v. Flagstar Bank*, 95–CV–73844

*Level of P's Harm—Scale of 1 to 10*

1—P experienced very little emotional harm as a result of D's actions, usually gave vague testimony as to feelings of hurt

5—P testified to experiencing real emotional harm, but not severe and/or was of a general nature, usually that he/she felt embarrassed or humiliated, maybe had some effect on his/her job

7—P gave more specific testimony of emotional harm, and may have also provided evidence that the lost loan opportunity effected P emotionally

10—P testified as to severe emotional harm, usually in cases where D directly discriminated against P

*Level of D's Conduct—Scale of 1 to 10*

1—D's conduct was not overt discrimination and proof of discrimination was not compelling and was circumstantial

5—D's conduct evidenced discrimination, usually proven by circumstantial evidence

7—D's conduct may have some evidence of direct discrimination, usually by statements from its agents and there was also stronger circumstantial evidence of discrimination

10—D's conduct was overt and direct

| CASE NAME | NATURE OF CONDUCT | INJURY | COMPENSATORY DAMAGES | PUNITIVE DAMAGES | JUDGE or JURY | LEVEL OF P's HARM | LEVEL OF D's CONDUCT |
|---|---|---|---|---|---|---|---|
| **Edwards and Paschal v. Flagstar Bank** | **Racial discrim. in mtg. lending process as to back applicants** | **emotional distress** | Edwards = $125,000 Paschals = $250,000 | $325,000 | Jury | 5 3 | 4 4 |
| Broome v. Biondi, 17 F.Supp.2d 211 (S.D.N.Y. 1997) **Plaintiffs** | Racial discrim. in denial of sublease to apt. to black couple - discrim. interview process | emotional distress and economic loss - embarrass. & humiliated by process | $230,000. | $410,000 | Jury Judge denied remittitur of punitive damages | 10 | 10 |
| Phinney v. Pearmutter, 222 Mich. App. 513 (1997) **Plaintiffs** | Whistleblower & retaliatory discharge - P said D stole her research | emotional distress, damage to career | $130,00 regarding stolen research & $989,00 regarding retaliatory discharge | | Jury Court of Appeals said damages not excessive | 5 | 6 |
| Stevenson v. Town Mtg, 94-CV-72202 (E.D. Mich.1995) (J. Gilmore) **Plaintiff/Defendant** | Racial discrim. in denial of mtg. for a duplex for single P | emotional distress, loss of opportunity | $80,000 | $50,000 | Jury | Don't know the facts so cannot quantify | Don't know the facts so cannot quantify |

| CASE NAME | NATURE OF CONDUCT | INJURY[a] | COMPENSATORY DAMAGES | PUNITIVE DAMAGES | JUDGE or JURY | LEVEL OF P's HARM | LEVEL OF D's CONDUCT |
|---|---|---|---|---|---|---|---|
| Boyer v. First VA Bank of MD, (D. Md. 1994) **Plaintiffs** | Racial discrim. in denial of home equity loan; P got loan at another bank | emotional distress to P, compensate FHC | $160,000 to P & $50,000 to FHC | | Consent Judgment | 6 | 7 |
| Simms v. First Gibralter Bank, (S.D. Tx. 1994), rev's on other grounds, 83 F.3d 1546 (1996) **Plaintiffs** | Racial discrim. in denial of mtg. to white apt. owner w/ black tenants | emotional distress, loss of business opportunity | $1,200,000 | $2,000,000 | Jury | 8 | 9 |
| Green v. Rancho Santa Margarita Mtg. Co, 33 Cal.Rptr.2d 706 (1994) **Plaintiffs** | Racial discrim. in denial of home mtg. to black couple - told could not find "a lender" for them | emotional distress years of savings were frustrated - both angry & hurt | $150,000 | | Jury Ct Appeals said award not excessive | 7 | 8 |

| CASE NAME | NATURE OF CONDUCT | INJURY | COMPENSATORY DAMAGES | PUNITIVE DAMAGES | JUDGE or JURY | LEVEL OF P's HARM | LEVEL OF D's CONDUCT |
|---|---|---|---|---|---|---|---|
| Green v. Ave. Bank of Oak Park, (N.D. Ill. 1992)  **Plaintiffs** | Racial discrim. in denial of mtg. to black couple to buy share in apt. building already owned in part | | | | $125,000 Settlement | 8 | 10 |
| Wilson v. GM Corp., 183 Mich. App. 21 (1990)  **Plaintiffs** | Race and gender discrim. in employment | lost wages, pain & suffering - P presented only her own testimony re her subjective feelings | $500,000 actual damages  $750,000 pain & suffering | | Jury  Judge remitted pain & suffering to $375,000  Ct Appeals reduced actual damages to $373,00 | 3 | 6 |
| Jenkins v. American Red Cross, 141 Mich. App. 785 (1990)  **Plaintiffs** | constructive discharge because of race | lost wages, emotional anguish | $850,000, which included $500,000 for emotional anguish | | Jury  Judge denied remittitur | 8 | 8 |

| CASE NAME | NATURE OF CONDUCT | INJURY | COMPENSATORY DAMAGES | PUNITIVE DAMAGES | JUDGE or JURY | LEVEL OF P's HARM | LEVEL OF D's CONDUCT |
|---|---|---|---|---|---|---|---|
| Grayson v. S. Rotundi & Sons Realty Co., (E.D.N.Y. 1984) **Plaintiffs** | Racial discrim. in denial of apt. rental to 2 black females - P would call & told apt. was ready and when show up - told no apt. | economic hardship, emotional distress - both angry, hurt & embarras. | $40,000 to P1 $25,000 to P2 | $250,000 to each P | Jury Ct. noted award was high, but wanted to deter D conduct | 7 | 9 |
| Kelly v. Sec.U.S. Dept. Housing, 97 F.3d 118 (6th Cir. 1996) **Defendant** | race and family discrim in apt. rental to black mother w/2 kids | economic hardship, emotional distress | Actual = ALJ awarded $6,000; Ct. Appeals reduced to $3,500 Emotional = ALJ awarded $3,500; Ct. Appeals reduced to $1,000 | | ALJ hearing | 4 | 4 |
| Johnson v Hale, 13 F.3d 1351 (9th Cir. 1994) **Defendant** | racial discrim. in refusal to rent to black men - landlord said her husband "would not let her rent to Negro men" but was polite | emotional distress | Trial Ct. awarded $125 to each P Ct. Appeals said at least $3,500 each and remanded case | | Judge - bench trial | 7 | 7 |

| CASE NAME | NATURE OF CONDUCT | INJURY | COMPENSATORY DAMAGES | PUNITIVE DAMAGES | JUDGE or JURY | LEVEL OF P's HARM | LEVEL OF D's CONDUCT |
|---|---|---|---|---|---|---|---|
| Ragin v. Harry Macklowe Real Estate Co, 6 F.3d 898 (2d Cir. 1993) **Defendant** | newspaper readers saw only white models in ads for apts. | emotional distress | $2,500 to each P $10,000 to OHC for expenses of resources | $62,500 | Judge - bench trial | 1 | 3 |
| Baumgardner v. HUD, 960 F.2d 572 (6th Cir. 1992) **Defendant** | gender discrim refused to rent to males b/c "messy and unclean" | emotional distress - male said incident "was kind of easy to get over with" | ALJ award $5,000; Ct. Appeals reduced to $1,5000 = $500 in emotional distress & $1,000 actual | ALJ award $4,000; Ct. App. reduced to $1,500 | ALJ hearing Ct. App. reduced award | 1 | 1 |
| Littlefield v. McGuffey, 954 F.2d 1337 (7th Cir. 1992) **Defendant** | Racial discrim in denial of apt due to race of P's boyfriend and child | emotional distress - landlord posted death threat on P's door to P's boyfriend | $50,000 | $100,000 | Jury | 10 | 10 |

| CASE NAME | NATURE OF CONDUCT | INJURY | COMPENSATORY DAMAGES | PUNITIVE DAMAGES | JUDGE or JURY | LEVEL OF P's HARM | LEVEL OF D's CONDUCT |
|---|---|---|---|---|---|---|---|
| In re HUD, 908 F.2d 864 (11th Cir. 1990)<br><br>**Defendant** | Racial discrim. by white homeowner who refused to sell to black couple & then rented to white couple | lost opportunity, emotional distress - hurt and angry & embarras. | $44,591, $40,000 for emotional distress $591 actual<br><br>Note: white couple got $20,000 for emotional and $600 actual | | ALJ hearing | 9 | 10 |
| Douglas v. Metro Rental Serv. Inc, 827 F.2d 252 (7th Cir. 1987)<br><br>**Defendant** | Racial discrim in refusal to rent apt. to black women and kids; black president of the rental agency opined it was be b/c black | emotional distress - P "looked differently" at co-workers and the public, more self conscious of racial status | $40,000<br><br>Ct Appeals reduced to $10,000 = $2,500 for each P | $75,000<br><br>Ct. Appeals reduced to $20,000 | Trial before Mag. Judge | 6 | 7 |
| Boyd v. Brandenburg, 932 F. Supp 198 (N.D. Ohio 1996)<br><br>**Defendant** | Racial discrim in housing - D threw fire bomb on P's porch | emotional distress, actual damages to porch | $1,000 actual $1,000 emotional | $1,500 | Judge - summary judgment | 7 | 7 |

| CASE NAME | NATURE OF CONDUCT | INJURY | COMPENSATORY DAMAGES | PUNITIVE DAMAGES | JUDGE or JURY | LEVEL OF P's HARM | LEVEL OF D's CONDUCT |
|---|---|---|---|---|---|---|---|
| U.S. v. Wagner, 930 F. Supp. 1148 (N.D. Tx. 1996) **Defendant** | handicap discrim. homeowners tried to prevent group home for mentally retarded kids by suing seller | loss of opportunity, emotional distress | $7000 for emotional distress plus legal fees | $8000 | Bench trial | 6 | 10 |
| Darby v. Heather Ridge, 827 F. Supp. 1296 (E.D. Mich. 1993)(J. Gadola) **Defendant** | Racial discrim. in refusal to rent apt. to black couple | emotional distress - very sad & depressed, low self confidence and self esteem | $200,000 Judge reduced to $50,000 = $37,000 for distress | $250,000 Judge reduced to $50,000 | Jury Judge remitted jury award | 5 | 6 |
| Laudon v. Loos, 694 F. Supp. 253 (E.D. Mich. 1988) (J. Cohn) **Defendant** | Racial discrim white tenant told could rent but no black visitors | emotional distress | $1,550 | | Judge - bench trial | 5 | 10 |

| CASE NAME | NATURE OF CONDUCT | INJURY | COMPENSATORY DAMAGES | PUNITIVE DAMAGES | JUDGE or JURY | LEVEL OF P's HARM | LEVEL OF D's CONDUCT |
|---|---|---|---|---|---|---|---|
| Pinchback v. Armistad Homes Corp. 689 F. Supp. 541 (D. Md. 1988) **Defendant** | Racial discrim prospective purchaser of co-op denied lease b/c black - told policy of no blacks | emotional distress | $ 2,500 | | Judge - bench trial<br><br>Ct not award punitive b/c it was a cooperative, but P got atty fees | 8 | 10 |
| Portee v. Hastava, 853 F. Supp. 597 (E.D.N.Y. 1994) **Defendant** | Racial discrim in refusal to rent to let black husband sign the lease - white wife had already signed - landlord kept check | emotional distress - husband emotionally "hurt," but no medical records, wife's job performance decreased for a time, child (5 years old) said sad about not getting own room and a pool | $100,000 to wife $100,000 to husband $80,000 to child | $32,000 | Jury<br><br>Trial court ordered new trial on comp. damages b/c excessive | 7 | 7 |

| CASE NAME | NATURE OF CONDUCT | INJURY | COMPENSATORY DAMAGES | PUNITIVE DAMAGES | JUDGE or JURY | LEVEL OF P's HARM | LEVEL OF D's CONDUCT |
|---|---|---|---|---|---|---|---|
| Bradley v. Carydale Enterprises, 730 F. Supp. 709 (E.D. Va. 1989)<br><br>**Defendant** | racial discrim in housing - D ignored P's racial harassment complaints and retaliated against her for filing compl. - which included that another Tenant called her a "nigger" | emotional distress - lost sleep, job performance suffered | $9,000 | | Jury | 6 | 4 |
| Moody v. Pepis-Cola, 915 F.2d 201 (6th Cir. 1990)<br><br>**Court** | age discrim in employment | emotional distress - shocked and humiliated, hard to find a new job, had to move away from family to get new job | $150,000 | | Jury | 7 | 6 |